841 F.2d 348
 24 Fed. R. Evid. Serv. 1196
 MIAMI INTERNATIONAL REALTY CO., Plaintiff, Counterclaim
Defendant, Appellee,
v.
Richard PAYNTER and Paynter & Hensick, P.C., Defendants,
Counterclaimants, Third Party Plaintiffs, Appellants,
v.
Marilyn LEFF, Martin Marcus, Sportsman Resort West, Inc.,
Saul Rudes, George Lax, Rudes & Lax, a law firm,
Third Party Defendants, Appellees.
 No. 86-1302.
 United States Court of Appeals,
Tenth Circuit.
 March 2, 1988.
Rehearing Denied Nov. 29, 1988.
 
 Paul D. Cooper of Cooper & Kelley, P.C. (Kim B. Childs and Charles R. Ledbetter, with him on the brief), Denver, Colo., for defendants, counterclaimants, third party plaintiffs, appellants.
 B. Lawrence Theis of Walters & Theis, Denver, Colo., for plaintiff, counterclaim defendant, appellee.
 John D. Phillips of Hall & Evans (Daniel W. Pinkston, with him on the brief), Denver, Colo., for third party defendants, appellees Saul Rudes, George Lax and Rudes & Lax.
 Before HOLLOWAY, Chief Judge, and SETH and McWILLIAMS, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 Miami International Realty Company ("Miami") sued Richard T. Paynter and his law firm, Paynter & Hensick, P.C. (collectively "Paynter"), in this diversity case for attorney malpractice. After a ten day jury trial, the jury rendered a verdict in favor of Miami, finding that Paynter had breached his professional duty to Miami thereby causing Miami to lose future profits which it otherwise would have received as the promoter of a time-share project in Mount Crested Butte, Colorado. The jury awarded $2,100,000 in damages to Miami, finding that it had lost $3,000,000 in profits and further finding that Paynter was 70% liable for that loss. In this appeal from the jury verdict, Paynter argues that the trial judge erred in several trial and pre-trial rulings.
 
 
 2
 Miami began to promote the Eagle's Nest Townhouses as a time-share project in early 1981. The time-share interests were marketed by Miami, as well as by Sportsman Resort West, Inc. and Sportsman Resort West of Texas, corporations which were apparently formed exclusively for the purposes of providing escrow and marketing support to Miami.
 
 
 3
 In the summer of 1981, Martin L. Marcus ("Marcus"), Miami's chief executive officer, learned that Miami could not legitimately engage in business in Mount Crested Butte unless it had a town business license. Near the end of 1981, neither Miami nor its related corporations had the town licenses. Marcus was then contacted by Paynter who was at that time a lawyer in private practice as well as the Mount Crested Butte town attorney. Paynter again informed Marcus that Miami could not operate legally in the town without the licenses. At a subsequent meeting Paynter suggested that he be retained by Marcus to obtain the licenses. Marcus, who before had unsuccessfully applied for the licenses, agreed to retain Paynter for assistance in getting the licenses.
 
 
 4
 As events unfolded, Paynter never helped in obtaining the licenses for Miami. At a February 4, 1982 meeting, Paynter advised Marcus that the town manager had pressured Paynter into terminating his attorney-client relationship with Miami because of a potential conflict of interest. Paynter further advised Marcus that the Colorado Real Estate Commission ("CREC") had undertaken an investigation of Miami and had concluded that Miami could not continue with the time-share project unless it was registered with the state as a subdivision developer. At this same meeting Marcus allowed Paynter to withdraw from further representation of Miami as to those matters which presented a potential conflict of interest for Paynter as the town attorney. Marcus requested, however, that Paynter continue to represent Miami to obtain the subdivision developer registration required by CREC. Paynter agreed to do so.
 
 
 5
 What remained of the attorney-client relationship between Paynter and Miami quickly soured after the above meeting. Paynter filed a three-count municipal offense charge against Marcus, one of his employees, and Sportsman Resort West of Texas on February 5, 1982 for operating without the town licenses which Paynter had been earlier retained, but failed, to obtain. Paynter prosecuted these charges until he was admonished by the presiding judge to withdraw from the case because of the apparent conflict of interest. Also, Paynter failed to tell Marcus that CREC officials had left a message at Paynter's office directing that Miami cease sales of time-share interests until Miami obtained the subdivision developer registration. Furthermore, Paynter advised CREC officials in a telephone conversation of February 11, 1982 that Miami would be likely to continue its sales operations regardless of his advice and that CREC should file a lawsuit against Miami if it wished to stop further sales.
 
 
 6
 Thereafter Paynter wrote to Marcus to inform him that the subdivider's registration application which he had submitted to CREC had been denied. However, this letter failed to inform Marcus of a telephone conversation Paynter had with CREC officials that CREC was contemplating a lawsuit against Miami, and that Miami could avoid the lawsuit by stopping its sales activity. Although Marcus was not told, Paynter informed the town council on the same day of the letter that CREC was going to file a suit against Miami. Indeed, several days later CREC filed a suit against Miami and obtained a temporary restraining order enjoining Miami from future sales activity. Miami's suit for attorney malpractice ensued.
 
 
 7
 Paynter argues that the trial court erred in failing to grant a directed verdict motion at the close of Miami's case. He contends that his motion should have been granted because Miami failed to prove, with the requisite degree of certainty, that it had suffered lost profits damages as a result of the claimed malpractice.
 
 
 8
 Whether to grant a motion for a directed verdict is a decision left to the discretion of the trial court. Ward v. H.B. Zachry Construction Co., 570 F.2d 892, 896 (10th Cir.). In determining whether the trial court has abused its discretion in denying such a motion by a defendant, we must look at the evidence in the light most favorable to the plaintiff. Ramsey v. Culpepper, 738 F.2d 1092, 1097 (10th Cir.).
 
 
 9
 In examining plaintiff's evidence on the issue of lost profits damages, we apply the substantive law of Colorado. Under Colorado law, a plaintiff who seeks lost profits as a measure of damages must prove by competent evidence that such profits would have been received but for the injury caused by the defendant. Republic National Life Insurance Co. v. Red Lion Homes, Inc., 704 F.2d 484, 489 (10th Cir.). Once the fact of damages is proved by a preponderance of the evidence, "uncertainty as to the amount of damages will not bar recovery." Tull v. Gundersons, Inc., 709 P.2d 940, 943 (Colo.) (emphasis added). As stated by the Colorado Court of Appeals in Cope v. Vermeer Sales and Service of Colorado, Inc., 650 P.2d 1307, 1309 (Colo.App.):
 
 
 10
 "The rule which precludes recovery of uncertain and speculative damages applies only where the fact of damages is uncertain, not where the amount is uncertain."
 
 
 11
 We applied Colorado law in Republic National Life Insurance Co., 704 F.2d at 489, when we held that once the loss of profits is attributed to the injury by the defendant, recovery of those lost profits as damages will not be denied "simply because the amount of profit lost is difficult to ascertain."
 
 
 12
 When we review the evidence in the light most favorable to Miami, it must be concluded that the fact of damages was proved by credible and substantial evidence. There is ample evidence in the record indicating that the time-share project would have been profitable for Miami. Furthermore, there is evidence in the record to support a jury conclusion that Miami lost these prospective profits as a result of Paynter's malpractice. In response to a special verdict question as to whether "the plaintiff, Miami International Realty Company, incur[red] damages," the jury responded in the affirmative. We hold that the jury's determination that Miami, itself, did suffer the damages occasioned by Paynter's malpractice is supported by evidence received during Miami's case-in-chief.
 
 
 13
 Neither can we accept as persuasive Paynter's contention that the nature of the evidence on the fact and quantum of lost profits damages was incompetent as proof of lost profits. In Webb v. Utah Tour Brokers Association, 568 F.2d 670, 678 (10th Cir.), we held that the form of the evidence adduced in support of the claim for lost profits is not significant, so long as it is credible and substantial. Colorado courts have held that the testimony of the injured party in and of itself may provide a sufficient basis for an award of lost profits damages. Power Equipment Co. v. Fulton, 513 P.2d 234, 237 (Colo.App.); Heckman v. Warren, 238 P.2d 854, 861 (Colo.). In addition, a jury award of lost profits damages need not be supported by documentary evidence under Colorado law as testimony alone will suffice "if the testimony is sufficiently credible and detailed." Republic National Life Insurance Co., 704 F.2d at 490; see also Heckman, 238 P.2d at 861.
 
 
 14
 In the instant case, the jury heard the testimony of Miami's principals as to the mounting success of the time-share project. The jury also heard expert testimony on the long-term feasibility of the time-share project and expert testimony on the projected net profits of the project. This testimony was a sufficient foundation for the jury's finding on Miami's lost profits damages. Paynter's challenges to the nature of the assumptions employed by the experts in formulating their opinions is without merit. Paynter's counsel challenged the assumptions on cross-examination and the jury was left to determine the weight to be given the expert testimony.
 
 
 15
 Paynter's claim that Miami's lack of a profit history should preclude the recovery of lost profits damages is similarly unavailing. Under Colorado law a plaintiff need not present evidence of a "track record" of prior profits in order to have the lost profits damages issue submitted to the jury. In Cope v. Vermeer Sales and Service of Colorado, Inc., 650 P.2d at 1309, in which a new business sued for lost profits but could not present evidence as to any prior profits, the court held that lack of such proof did not per se preclude the possibility of lost profits damages, writing that
 
 
 16
 "where ... there is more than the mere anticipation of starting a new business, the distinction between established businesses and new ones is one of degree, and goes to the weight to be given such evidence."
 
 
 17
 In the instant case, Miami's feasibility expert testified that "[i]n most time-share programs there is a negative cash flow at the beginning of the project." The jury apparently believed the testimony indicating that Miami's time-share project was bound to be profitable. Based upon our review of the record, we conclude that such a belief finds a substantial basis in the evidence adduced at trial.
 
 
 18
 As indicated in the foregoing, the trial judge was clearly within the bounds of his discretion when he submitted the issue of lost profits damages to the jury. The denial of defendant's motion for a directed verdict was not error.
 
 
 19
 Based upon such testimony, we conclude that the jury acted reasonably when it concluded that Miami lost profits of $3,000,000 when the time-share project was jettisoned.
 
 
 20
 Paynter alleges as further error the admission of testimony pertaining to "revenues earned by unlicensed or illegal sales." Paynter's argument is that since the sales people employed by Miami were not licensed real estate brokers as required by Colorado law, the sales commissions which they earned may not be used as a foundation for lost profits projections. However, Miami here seeks as a measure of damages only those profits which it lost as a result of Paynter's negligent acts. Paynter relies on Manufacturer's National Bank of Detroit v. Hartmeister, 411 F.2d 173 (10th Cir.), and Barton v. Sittner, 723 P.2d 153 (Colo.App.), on this issue. In those cases, as in Brakhage v. Georgetown Associates, Inc., 523 P.2d 145, 146 (Colo.App.), the courts held that "one who functions as a real estate broker without obtaining the necessary license cannot recover compensation for his services." The cited cases are limited, however, to those cases in which the owner of real estate raises the violation of the Colorado licensing requirement as a defense to a breach of contract action brought by an unlicensed agent or broker for unpaid commissions. See Colo.Rev.Stat. Secs. 12-61-101 to -122 (1985). We find it significant that in Holter v. Moore, 681 P.2d 962 (Colo.App.), the Colorado courts construed the statutes to preclude a private cause of action for violation of the regulatory scheme. Thus, our review of the pertinent Colorado law indicates that Paynter does not have standing to raise the issue of Miami's noncompliance with Colorado licensing requirements in mitigation of damages in this tort suit.
 
 
 21
 The final point related to the damages issue is Paynter's argument that the trial judge erroneously limited his cross-examination of two witnesses for plaintiff. In United States v. Swingler, 758 F.2d 477, 497 (10th Cir.), we held that
 
 
 22
 "the trial court is the governor of the trial with a duty to assure its proper conduct and the limits of cross-examination necessarily lie within its discretion. And we should not overrule the exercise of that discretion unless we are convinced that the ruling of the court was prejudicial."
 
 
 23
 Citing Foster v. United States, 282 F.2d 222, 224 (10th Cir.). Our review of the trial transcript indicates that the trial judge acted within his discretion in limiting the scope of Paynter's cross-examination.
 
 
 24
 We conclude that the issue of lost profits damages was properly submitted to the jury and there is an adequate evidentiary basis supporting the award of $2,100,000 in lost profits damages to Miami.
 
 
 25
 Paynter further argues that the trial judge erred when he admitted certain testimony of Miami's legal expert. Specifically, Paynter contends that the legal expert should not have been allowed to testify that Paynter's conduct was contrary to the Colorado Code of Professional Responsibility since the Code sets forth an ethical standard rather than a professional negligence standard of care. The defendant filed a motion in limine directed to the expected use of the Code which was denied. The testimony of the witness was objected to at trial.
 
 
 26
 In Colorado, "[a]n attorney owes his client a duty to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession." Myers v. Beem, 712 P.2d 1092, 1094 (Colo.App.). Colorado courts have not decided how its Code of Professional Responsibility is to be treated as an element of proof in a malpractice case.
 
 
 27
 There is, of course, an underlying issue of the general relevancy of the Code which pretty much falls into place, but here the troublesome aspect of the expert's testimony who testified as to Code provisions is how the conclusion that there was a Code violation was used or how it was presented to the jury. If the acts presented by the witness were concluded to be a violation of the Code and were therefore negligence per se, the Code has been improperly used. The preamble of the Code states:
 
 
 28
 "The Code makes no attempt to prescribe either disciplinary procedures or penalties ... nor does it undertake to define standards for civil liability of lawyers for professional conduct."
 
 
 29
 The expert witness here stated that he was on the state ethics committee for twelve years, on the Colorado Supreme Court Grievance Committee for years, and recited that the Code was a court rule. The witness compared defendant's conduct to particular Code provisions (DR5-101) and concluded that defendant's action was "substandard" as attorneys in Colorado were guided by the Code. The witness testified that certain specific acts of defendant (and inaction) were "substandard." There was an instruction requested but none was given as to how the Code violation was to be viewed. The plaintiff in its brief describes the expert as having given the "community standard of care." The parties agree that a Code violation does not create a private right of action. See also Merritt-Chapman & Scott Corp. v. Elgin Coal, Inc., 358 F.Supp. 17 (E.D.Tenn.); Noble v. Sears, Roebuck & Co., 33 Cal.App.3d 654, 109 Cal.Rptr. 269. The Colorado Supreme Court in Bryant v. Hand, 404 P.2d 521, 522, stated: "The canons of ethics are not binding on the courts and do not have the force of law."
 
 
 30
 We have examined the transcript and although the expert witness for the plaintiff at the outset of his testimony did refer to the Code as a standard followed by Colorado attorneys, it was not presented as having the force and effect of a law nor that deviations from it constituted negligence per se.
 
 
 31
 The testimony did not develop any fine distinctions as to the nature of defendant's conduct compared to the Code as the conduct, according to the evidence, was gross under any standard, and it seems reasonable that it made no difference to the jury whether there was a Code or not. We must conclude that the testimony as to the Code of Professional Responsibility as admitted was not error.
 
 
 32
 Paynter's appeal also raises an issue regarding the propriety of Miami counsel's closing argument. During his closing argument, Miami's counsel argued to the jury that Paynter's defense to the malpractice action could be characterized as "the big lie defense." Paynter contends that this argument was impermissibly prejudicial and that the trial judge should have granted his motion for a new trial because the argument influenced the jury. Counsel's reliance on "the big lie defense" appears to have been intended as a broad characterization of the general incredulity of Paynter's defense, and not as a personal comment on the veracity of any particular witness. We find no error as to this argument.
 
 
 33
 Paynter urges that the trial judge erred in dismissing Paynter's counterclaims for negligent misrepresentation, civil conspiracy, and outrageous conduct prior to trial. "This court conducts de novo review of a grant of a motion to dismiss." Weatherhead v. Globe International, Inc., 832 F.2d 1226, 1228 (10th Cir.).
 
 
 34
 Paynter's first claim for relief against the counterclaim defendants was based on a theory of negligent misrepresentation. Colorado law has incorporated the tort of negligent misrepresentation as defined in the Restatement (Second) of Torts Sec. 552(1). See, e.g., Robinson v. Poudre Valley Federal Credit Union, 654 P.2d 861 (Colo.App.); First National Bank in Lamar v. Collins, 616 P.2d 154 (Colo.App.). The Restatement states that
 
 
 35
 "[o]ne who, in the course of his business, ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
 
 
 36
 The elements of the negligent misrepresentation cause of action must, of course, be looked at in conjunction with general principles of negligence law.
 
 
 37
 "[B]efore a negligence action can be maintained [in Colorado], there must be a duty of care owed by the defendant to the plaintiff ... and a breach by defendant of that duty with resultant damages. Whether there is such a duty is a question of law to be decided by the court based on the facts presented."
 
 
 38
 Turner v. Grier, 608 P.2d 356, 358 (Colo.App.) (citations omitted).
 
 
 39
 The trial judge applied the foregoing law to the facts alleged in Paynter's counterclaim for negligent misrepresentation and found that Paynter had failed to state a claim for relief since "as a matter of law, a client has no duty under Colorado law and the Restatement (Second) of Torts Sec. 552 to provide his lawyers with accurate information." While the Supreme Court of Colorado has not ruled on the scope of the duty owed by a client to his or her attorney, if any, the trial judge's decision comports with the sparse authority which has addressed the issue. We find no error in the court's ruling on this issue. In his order dismissing the counterclaims in the instant case, the trial judge observed that "[t]here is a considerable difference between considering the client's conduct as a defense to a malpractice action and treating it as a basis for a claim for relief of the lawyer."
 
 
 40
 Paynter also pled a civil conspiracy cause of action in his counterclaim. The trial judge dismissed the civil conspiracy claim, noting that Paynter had failed to allege that any overt acts were undertaken in furtherance of the conspiracy as is required by Colorado law. We agree with this ruling.
 
 
 41
 We have considered the several additional points urged by the defendant and conclude that they are without merit.
 
 
 42
 The judgment entered on the jury verdict rendered after the trial of this cause is hereby AFFIRMED.