**John H. ROBERTS, Jr. and RISCOR, Inc., Plaintiffs–Appellants and Cross–Appellees,**

**v.**

**HOLLAND & HART, Defendant– Appellee and Cross– Appellant.**

**No. 91CA1270.**

Colorado Court of Appeals, Div. IV.

Jan. 28, 1993.

Rehearing Denied March 4, 1993.

Certiorari Denied Aug. 30, 1993.

Bader & Villanueva, P.C., Jeffrey M. Villanueva, Denver, Weil & Petrocchi, P.C., Christopher M. Weil, Dallas, TX, for plaintiffs-appellants and cross-appellees.

Holme Roberts & Owen, Daniel J. Hoffman, Lawrence M. Zavadil, John R. Webb, Denver, for defendant-appellee and cross-appellant.

Opinion by Judge PLANK.

In this legal malpractice action against defendant, Holland and Hart, plaintiffs, John H. Roberts, Jr., and RISCOR, Inc., appeal from a partial summary judgment dismissing their claim for lost profits. Plaintiffs also appeal the trial court's ruling that they are entitled to damages only in the amount of the attorneys' fees paid for work negligently completed by Holland & Hart, rather than for all attorneys' fees paid to that firm. Finally, plaintiffs challenge the trial court's dismissal of certain claims assigned to RISCOR by application of the principle that legal malpractice claims are not assignable. Holland & Hart cross-appeals the trial court's denial of its motion for a directed verdict on damages because it claims Roberts failed to present evidence that he had paid or was liable for any of the attorney fees paid to the defendant. We affirm.

Roberts, a real estate developer, purchased Commerce Savings Association of Angleton, Texas (Commerce), which he used to facilitate real estate acquisitions and development.

In 1983, under Roberts' direction, Commerce hired Holland & Hart to handle the legal work necessary to acquire a number of properties in the town of Aspen. Roberts' goal was to develop a hotel, convention, and retail center on the properties. Holland & Hart's services to Commerce, and later it appears Roberts or another of his alter egos, Downhill Associates, Inc., consisted primarily of assistance in acquiring additional lots and obtaining the proper zoning for a Planned Unit Development (PUD).

In 1984, Roberts purchased Commerce's interest in the properties for $44 million, in exchange for a note and deed of trust in the same amount. A second mortgage by Mainland Savings (Mainland) encumbering the property in the amount of $16 million was obtained in 1985.

As part of the necessary land acquisitions, Commerce sought to exchange mining claims it owned on Aspen Mountain for land held by Aspen Ski Company (ASC) within the city of Aspen. ASC was also a client of Holland & Hart. Both clients consented to this dual representation and that is not an issue here.

Holland & Hart admits its negligence in drafting the legal description of Commerce's property which was exchanged for the ASC land. Basically, the legal description not only conveyed the mining claims, but the southern half of the town of Aspen, including all of the land within the PUD. However, since none of the parties realized the mistake, the PUD was recorded.

Roberts had negotiated for an operation agreement for a hotel to be built on part of the property with the Ritz–Carlton Hotel Company. Roberts alleges that all he needed then to complete the project was a financial lender. No major development project of Roberts had been successful, and Roberts was insolvent.

At this time, the property was still encumbered by the $44 million note to Commerce and the $16 million note to Mainland. In December of 1985, Commerce began foreclosure proceedings against the properties. By threatening Commerce with putting the entire project into Chapter 11 Bankruptcy, Roberts was able to negotiate an agreement that Commerce would foreclose the properties as two separate parcels. Roberts was basically interested only in the hotel site land, and, on March 9, 1986, Commerce agreed to divide the property into two parcels, to be bid on separately: one parcel for $17.5 million, and the second for the remainder of the amount owed.

The purpose of this agreement was to enable Roberts to redeem only the portion of the properties he was interested in for $17.5 million. Roberts asserts that he was having difficulty finding a financier for the entire $44 million and that it would have been easier to obtain financing for the lower amount. Thus, from the time of the contemplated foreclosure, March 10, 1986, Roberts would have had 75 days to redeem lots 1, 4, and 5, by finding a lender for the project.

In order to sustain a profit on the transaction, Roberts had to recover the $17.5 million redemption money, another $16 million to cover the second mortgage to Mainland, and several hundred thousand dollars in mechanics' liens also encumbering the properties. Thus, Roberts would have had to sell the property for over $34 million to make a profit.

On March 10, 1986, the error in the legal description was discovered. As a result, the foreclosure proceedings were stayed close to the end of the 75–day period, and an action was brought to quiet the title.

On March 27, 1987, a year after the initial agreement between Roberts and Commerce, the district court ordered that Commerce could go forward with the foreclosure, and further ordered that Commerce had to proceed according to the March 9, 1986, agreement between Commerce and Roberts, bidding the properties in two separate bids.

Roberts was unable to obtain the financing he needed in this second 75–day period. Through various agreements between Commerce and other parties, Roberts disassociated himself from the properties.

Sometime in 1987, Roberts, through Downhill Associates, made an assignment of 100% of his rights to the malpractice claim to RISCOR, Inc. In 1988, RISCOR, Inc., assigned back to Roberts 50% of the claim.

Roberts and RISCOR, Inc., subsequently brought this suit against Holland & Hart, alleging that but for the error in the legal description, Roberts would have obtained the financing necessary to complete the project. Roberts basically alleges that the change in the real estate markets and the collapse of the savings and loan industry which occurred during the time that the quiet title action was pending in the district court prevented him from obtaining the necessary financing.

## I.

Plaintiffs first contend that the trial court erred by granting defendant's summary judgment motion dismissing RISCOR, Inc., from the suit because legal malpractice claims are not assignable. We disagree.

The question of assignability of legal malpractice claims has never been addressed in Colorado. We now hold that legal malpractice claims are not assignable.

 While the law favors assignability of rights generally, it does not allow assignments for matters of personal trust or confidence, or for personal services. *Matson v. White,* 122 Colo. 79, 220 P.2d 864 (1950); *Scott v. Fox Brothers Enterprises Inc.,* 667 P.2d 773 (Colo.App.1983).

 In our view, the assignment of legal malpractice claims involve matters of personal trust and personal service and do not lend themselves to assignability because permitting the transfer of such claims would undermine the important relationship between an attorney and client.

In the fourteen jurisdictions in which the issue of assignability of legal malpractice claims has arisen, nine have held such claims non-assignable. *Schroeder v. Hudgins,* 142 Ariz. 395, 690 P.2d 114 (App. 1984); *Goodley v. Wank & Wank, Inc.,* 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976); *Mickler v. Aaron,* 490 So.2d 1343 (Fla.Dist. Ct.App.1986); *Brocato v. Prairie State Farmers Insurance Association,* 166 Ill. App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200 (1988) *appeal denied,* 121 Ill.2d 567, 122 Ill.Dec. 434, 526 N.E.2d 827 (1988); *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338 (Ind.1991); *Coffey v. Jefferson County Board of Education,* 756 S.W.2d 155 (Ky. App.1988); *Thurston v. Continental Casualty Co.,* 567 A.2d 922 (Me.1989); *Moorhouse v. Ambassador, Inc.,* 147 Mich.App. 412, 383 N.W.2d 219 (1985); *Chaffee v. Smith,* 98 Nev. 222, 645 P.2d 966 (1982); *contra: Scarlett v. Barnes,* 121 B.R. 578 (W.D.Mo.1990); *Oppel v. Empire Mutual Insurance Co.,* 517 F.Supp. 1305 (S.D.N.Y. 1981) (interpreting New York law); *Collins v. Fitzwater,* 277 Or. 401, 560 P.2d 1074 (1976); *Hedlund Manufacturing v. Weiser, Stapler & Spivak,* 517 Pa. 522, 539 A.2d 357 (1988).

We are persuaded by the reasoning in *Goodley v. Wank & Wank, Inc., supra,* and *Picadilly, Inc. v. Raikos, supra.* In *Goodley,* the court stated the following:

The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litiga-

tion, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley v. Wank & Wank, Inc.,* 62 Cal. App.3d at 397, 133 Cal.Rptr. at 87. Accordingly, we hold that the assignment of legal malpractice claims is against public policy.

The Rules of Professional Conduct conflict with an assignment of malpractice claims, specifically with an attorney's duty to maintain client confidentiality and duty of loyalty. *See Picadilly, Inc. v. Raikos, supra.* The Colorado Rules of Professional Conduct, Rule 1.6 provides that: "A lawyer shall not reveal information relating to representation of a client.... [but] a lawyer may reveal such information to the extent the lawyer reasonably believes necessary to establish a claim or defense in a controversy between the lawyer and the client...."

We are also concerned that an attorney's duty of loyalty to his client could be compromised by anticipating an assignment of possible legal malpractice claims. Many of the cases addressing the issue of assignability are based on situations in which a losing defendant has assigned a malpractice claim to a victorious plaintiff. Thus, "[i]f assignments were permitted, we suspect that they would become an important bargaining chip in the negotiation of settlements—particularly for clients without a deep pocket." *Picadilly, Inc. v. Raikos,* 582 N.E.2d at 343.

The possibility of assignments places attorneys in the awkward position of both zealously protecting all of a client's rights and of being concerned that a possible future claim of malpractice could be used to settle a client's case or a client's debt to a stranger. "[S]uch claims would relegate

the legal malpractice action to the marketplace, which would encourage unjustified suits, increase legal malpractice litigation, and force attorneys to defend themselves against strangers." *Moorhouse v. Ambassador, Inc.,* 147 Mich.App. at 414, 383 N.W.2d at 221.

Hence, we hold that the trial court properly granted defendant's motion for summary judgment against RISCOR, Inc.

### II.

Plaintiffs next contend that the trial court erred in granting a motion for partial summary judgment denying them the right to seek damages for lost profits. We disagree.

Summary judgment is appropriate when the pleadings, affidavits, depositions, or admissions establish there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Continental Air Lines, Inc., v. Keenan,* 731 P.2d 708 (Colo.1987).

■ The moving party has the burden of establishing the nonexistence of a material fact. If the burden of persuasion would belong to the non-moving party at trial, the moving party needs only to identify those portions of the record and of the affidavits which demonstrate an absence of a genuine issue of material fact. If the non-moving party cannot produce enough evidence to establish a triable issue, then a trial would be useless and summary judgment is proper. *Continental Air Lines, Inc. v. Keenan, supra.*

Roberts claims that, but for the defendant's negligence in drafting the legal description, he presumably would have been able to acquire the necessary financing within the 75–day window following Commerce's foreclosure. Roberts further claims that he established a loss of future profits in fact and that only the amount of the loss was uncertain.

■ A claim for future profits may not be sustained by evidence which is speculative, remote, imaginary, or impossible of

ascertainment. *Lee v. Durango Music,* 144 Colo. 270, 355 P.2d 1083 (1960).

■ To support a claim for damages based on lost profits, a plaintiff must establish the fact of damages by a preponderance of the evidence. A plaintiff is not barred from recovery because the amount of damages cannot be established with mathematical certainty once the fact of damage has been established. *Pomeranz v. McDonald's Corp.,* 843 P.2d 1378 (Colo. 1993); *Tull v. Gundersons Inc.,* 709 P.2d 940 (Colo.1985). We also hold that a claim for lost net profits may be properly raised in a suit alleging legal malpractice. *See Miami International Realty Co. v. Paynter,* 841 F.2d 348 (10th Cir.1988).

■ Damages for lost net profits must be traceable to and the direct result of the negligent act. *Runiks v. Peterson,* 155 Colo. 44, 392 P.2d 590 (1964).

■ A new business venture may make a claim of lost net profits, provided there is more than mere anticipation of starting a business, such as investment of time or money. *Cope v. Vermeer Sales & Service,* 650 P.2d 1307 (Colo.App.1982).

■ Documentary evidence of profit loss is preferred when practical. *Republic National Life Insurance Co. v. Red Lion Homes, Inc.,* 704 F.2d 484 (10th Cir.1983); *Lee v. Durango Music, supra.* Damages can, however, be awarded based on undocumented testimony by the plaintiff or other witnesses. *Miami International Realty v. Paynter, supra; Power Equipment Co. v. Fulton,* 32 Colo.App. 430, 513 P.2d 234 (1973). Still, damages cannot be based upon only the speculations, guesses, or estimates of witnesses. *United States v. Griffith, Gornall & Carman, Inc.,* 210 F.2d 11 (10th Cir.1954).

First, plaintiffs assert that the trial court focused on the uncertainty of the amount of damage rather than the fact of damage. We disagree. The record reflects that the trial court used the proper test.

■ The dispositive issue thus becomes whether the plaintiffs have shown a genuine material issue regarding the fact of lost profits.

Applying Colorado law in a case involving the development of a tract-home site, the United States Court of Appeals for the Tenth Circuit upheld the use of undocumented testimony by the plaintiff that there was "adequate financing, equipment, and personnel to complete the construction and resale of the homes, that [developer] was an experienced tract home developer, that past experience and rudimentary market analysis indicated that the homes would have sold easily, and that past experience indicated that [developer] would have earned a profit on the construction and sale of the homes." *Republic National Life Insurance Co. v. Red Lion Homes, supra,* at 489, 490. While undocumented, the court found that the testimony was unchallenged, specific, and consistent; thus, it was held that a directed verdict was not appropriate because there was a probability that, but for the defendant's negligence, the tract-home development would have been profitable and the jury's award of lost profits was not speculative.

Here, though, the trial court found that any evidence of lost profits was speculative and was based upon guesses and generalizations of Roberts and the affiants statements submitted in response to defendant's motion for partial summary judgment.

Under the March 9, 1986, agreement with Commerce, Roberts contends he could have redeemed the property for $17.5 million, and could have sold it for at least $25 million. Roberts claims that this would have resulted in a profit of $7.5 million, but he does not appear to take into account the $16 million second mortgage nor the mechanics' liens. Thus, there is no credible evidence that Roberts would have actually made any profit, even if he had been successful in redeeming the property.

Roberts did present an affidavit in which the affiant stated that the project would have made a net profit of $36 million. That affiant, however, offers no explanation of how he calculated this figure; thus, it is speculative and conjectural.

This affidavit also contains various hearsay statements that would not have been admissible in evidence and which were, therefore, properly disregarded by the trial court. *See In re Estate of Abbott,* 39 Colo.App. 536, 571 P.2d 311 (1977).

Another affidavit submitted by Roberts contains the affiant's opinion that the property had a value "substantially in excess" of $17.5 million. But, the affiant does not state how much in excess and does not state that Roberts would have necessarily made a profit.

Finally, Roberts' own testimony does not raise a genuine issue of material fact of damage. Roberts' theory to the trial court, stated in his brief to this court, was that, "[h]e had a project that someone could have walked in and built immediately if that someone had money." But, the record reveals that the entire project was too speculative in nature to warrant lost profits damages because the whole project was contingent upon finding a financier for an amount well above $17.5 million, and there is no evidence to suggest that such financing was available.

We also disagree with Roberts that the lack of evidence of lost profits was caused by the defendant's negligence. Without showing that a viable financier existed, the plaintiff did not submit any admissible evidence to contradict the motion for summary judgment. That is, he failed to present evidence indicating that, but for the negligence of the defendant, he probably would have sustained a profit.

Hence, we hold that the plaintiffs did not raise a genuine issue of material fact on the issue of lost net profits, and the trial court properly granted partial summary judgment in defendant's favor.

### III.

Plaintiffs finally contend that the trial court erred by instructing the jury that Roberts could recover attorney fees from the defendant only for negligent work rather than all fees paid to defendant. We disagree.

Roberts seeks to recover all of the fees paid to Holland & Hart between 1983 and the discovery of the legal description error: $868,515. His theory is that because the negligently drafted description caused the project to fail, that deficiency caused the value of the defendant's services to be worthless.

Although he could have, Roberts did not make a claim at trial for attorneys' fees paid to correct Holland & Hart's mistake. *See Scognamillo v. Olsen,* 795 P.2d 1357 (Colo.App.1990). Thus, Roberts' claim for attorney fees is limited to the fees paid to Holland & Hart for the services that were performed incompetently. *See generally Rosebud Mining & Milling Co. v. Hughes,* 16 Colo.App. 162, 64 P. 247 (1901).

We agree with the trial court's April 2, 1991, order: "Roberts is not entitled to recover fees paid for work which he does not claim was negligently performed since to do so would be granting him a windfall." *See also* R. Mallen & J. Smith, *Legal Malpractice* § 16.18 at 911 (3rd ed. 1989): "[A]n attorney should be able to reduce a damages award which is based upon hypothetical competent performance by subtracting the agreed or reasonable fees which should have been paid by the client. This measures what the client should have received, and does not involve an affirmative action by the attorney to actually recover a judgment for fees." Hence, we hold it was not error to instruct the jury that it could award damages only for work negligently performed by Holland & Hart.

Roberts' assertion that he should recover all fees is based on the same premise as his claim for lost profits: but for Holland & Hart's negligence, he would have reaped the benefits of a successful development. This argument differs from cases like *Rosebud Mining & Milling Co. v. Hughes, supra,* in which a total recovery of fees was allowed because the attorney performed no services for the client. Here, Roberts claims that because the development was not successful, the value of Holland & Hart's entire service on the project was nullified.

Roberts has not, however, presented sufficient evidence that the project would have been successful. If he had, he could seek damages for lost profits. But, a recovery of both lost profits and of attorney fees would be a windfall, since he would have incurred the attorney fees if the project had been successful.

## IV.

Defendant contends that the trial court improperly denied its motion for a directed verdict on damages because it claims Roberts offered no proof that he paid, or was liable for, payment of the attorney fees owed to defendant for the negligently performed work. We perceive no error.

When reviewing a trial court's decision to deny a motion for a directed verdict, we must ask whether a reasonable jury, after drawing all possible inferences from the evidence presented, could reach the same verdict delivered at the trial. *Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984). We must also view the available evidence which led to the jury verdict in a manner most favorable to the prevailing party. *Meiter v. Cavanaugh*, 40 Colo. App. 454, 580 P.2d 399 (1978).

To recover expenses allegedly incurred as a result of wrongful or negligent professional conduct, a plaintiff must prove either payment or legal liability to pay such expenses. *See* Annot., 65 A.L.R.2d 1426 (1959).

Here, the record reveals little evidence concerning the relationship between Roberts and Holland & Hart. What evidence there is however, when viewed in a manner most favorable to the verdict, reasonably establishes the existence of an attorney-client relationship between the parties at the time the work was performed, and thus, a legal liability to pay the expenses was incurred by Roberts. That evidence includes the statements of a Holland & Hart attorney which acknowledges Robert's status as a client throughout 1985.

Thus, we will not disturb the trial court's upholding of the jury verdict.

Accordingly, the judgment is affirmed.

TURSI and METZGER, JJ., concur.