Gloria **CHARLES, Individually and on Behalf of the Estate of Gilberto Charles, Deceased, Appellant,**

v.

Raul **TAMEZ and Adams & Graham, L.L.P., (Intervenor), Appellees.**

No. 13–93–452–CV.

Court of Appeals of Texas, Corpus Christi.

March 31, 1994.

Rehearing Overruled May 26, 1994.

---

R. Bruce Phillips, Fleuriet & Schell, Harlingen, Philip Maxwell, Longley & Maxwell, Austin, for appellant.

Moises Vela, Vela & Vela, Harlingen, Edward Stapleton, III, Frank Costilla, Yolanda De Leon, Costilla & Stapleton, Brownsville, for appellees.

Before SEERDEN, KENNEDY and DORSEY, JJ.

**OPINION**

KENNEDY, Justice.

Gloria Charles, individually and on behalf of the estate of Gilberto Charles, sued Raul Tamez and others for damages resulting from the personal injuries and wrongful death of Gilberto Charles. After prevailing on the merits, Charles sought turnover by Tamez of two choses in action. Tamez's attorneys, the law firm of Adams & Graham, L.L.P., intervened. The court denied Charles her requested relief. She appeals by four points of error. We affirm.

Gilberto Charles was seriously injured in a car wreck while a passenger of Tamez. Tamez turned left into the path of an oncoming truck. Mr. Charles was paralyzed. He received treatment at Valley Baptist Medical Center and a Veterans' Administration hospital. The Charleses sued Tamez two weeks after the accident. Tamez was insured by Farmers Texas County Mutual Insurance Company. Farmers hired Adams & Graham to defend the suit by the Charleses. Mr. Charles died less than two months after the accident.

On March 25, 1991, Mrs. Charles's attorneys hand-delivered a letter offering to settle all claims in the suit brought personally and on behalf of her husband's estate. The letter offered to settle for $20,000, the limit of Tamez's policy. The letter stipulated that the offer would expire at 5 p.m. on the fifteenth day after the date of the letter. The fifteenth day was April 9.

The parties' perception of events following the transmission of the offer diverge and

form part of the basis of the causes of action that Charles asserts Tamez possesses. Adams & Graham mailed a response on March 27 which Charles interpreted as saying that Tamez would not agree to the settlement unless he received a release from Mrs. Charles as well as Mr. Charles's parents; Adams & Graham asserts that they responded that they could accept the offer if Tamez got the releases and indemnity against all lienholders. Charles's attorneys declined, but left the original offer open. On April 11, Adams & Graham dropped the demand that Charles's attorneys get releases from Mr. Charles's parents. Charles's attorneys rejected this purported acceptance because it was made two days after the deadline. Adams & Graham contend that Charles's attorneys did not inform them of the liens held by the two hospitals.

The case proceeded to trial. The jury found Mr. Charles contributorily liable for forty-five percent of his injuries. Tamez was found liable for $32,354.12 to Mrs. Charles and $148,163.22 to Mr. Charles's estate for a total of $180,517.34 in damages plus post-judgment interest and costs. The judgment was not appealed. The judgment remains unsatisfied except for the policy amount, which Adams & Graham says was sent to lienholders.

In her attempt to collect on the judgment, Mrs. Charles found that Tamez had no non-exempt assets subject to execution—none, that is, except for possible lawsuits against his representatives for their failure to accept the settlement offer for policy limits. *See G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544, 547 (Tex.Comm'n App.1929, holding approved); *see also Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595, 608 (Tex.App.—Tyler 1984, writ ref'd n.r.e.). Mrs. Charles originally sought turnover in December 1992 by Tamez only of the suit against Farmers. She served Tamez through attorneys Jaime Balli of Adams & Graham and Moises Vela.

Vela and attorneys from Adams & Graham represented Tamez at the January 21, 1993 hearing on the turnover motion. The court admitted Tamez's affidavit in which he denied dissatisfaction with Farmers or Adams

& Graham's representation of him. Tamez averred that he would not have permitted Farmers to settle for policy limits if such settlement left him exposed to liens by the hospitals. The court granted turnover of Tamez's claims against Farmers and any other parties liable for the manner Farmers oversaw Tamez's defense. Tamez moved for new trial.

At the hearing on the motion for new trial on April 15, 1993, Adams & Graham represented Tamez without Vela. Tamez reasserted that the failure to settle was not unreasonable and thus no cause of action existed to be turned over. He also contended that the turnover order was too broad because it included claims against "any other liable parties;" Charles agreed, and submitted a modified order limiting potential liability to persons associated with Farmers and Adams & Graham. Both sides also agreed that the order should require accounting for excess to Tamez. Charles asked the court to order a sheriff's sale of the causes of action to determine their value. The court entered Charles's proposed modified order. The order required accounting to Tamez only of the excess proceeds from the sale, not of any excess from the suits.

Adams & Graham moved to intervene and to quash the sale. Tamez, now represented by Vela alone, also moved to quash the sale, reiterating his complaint that the turnover was not supported by evidence of a real claim and that the order was vague as to the nature of the claims to be sold. He complained that the order erroneously put the entire claims up for sale rather than only the amount of Tamez's debt. He also argued that malpractice claims are exempt and unassignable. Charles moved to strike the intervention of Adams & Graham, contending that it came after the final judgment and was thus too late.

In live testimony at the May 6, 1993 hearing on the motion to quash, Tamez reiterated his assertion that he would not have approved the settlement if it left him exposed to liability to the hospitals. He also emphasized his satisfaction with his legal counsel. He said that no one had told him that his attorneys committed malpractice. Edwin

Fleuriet, Charles's counsel, took the stand and testified that Tamez's Adams & Graham attorneys had come to his offices and admitted in May or June 1991 that they had committed malpractice under *Allstate v. Kelly* by failing to accept the settlement offer; Fleuriet said that the Adams & Graham attorneys offered to use their malpractice coverage to effectuate the settlement. Fleuriet said that he rejected their offer because he believed that their admission would expand the amount that he could recover for his client. At the end of the hearing, the court allowed Adams & Graham to intervene, denied the motion to strike the intervention, and quashed the sale of the causes of action against both Farmers and Adams & Graham.

The court entered findings of fact and conclusions of law on June 14, 1993 to support its order quashing the sale. The court found that Tamez did not believe he had a claim against his representatives and therefore did not desire to sue. The court also found that Charles had not established that Tamez had any such claims. Based on these findings, the court exercised its discretion and denied turnover.

On June 7, 1993, Charles moved for new trial and for modification of the order granting Adams & Graham's motion to quash and Tamez's motion for new trial. On July 20, 1993, the court denied Charles's motion. On July 28, 1993, Charles perfected her appeal by filing a deposit of cash in lieu of a cost bond.[1]

■ By point of error four, Charles contends that the court erred when it allowed Adams & Graham to intervene. Even were we to find that the court erred by allowing the intervention, however, we see no causal connection between the intervention and the judgment complained of in this case. As Adams & Graham had represented Tamez in

the early stages of this motion, its voice was not new to the proceeding. Setting aside the heated dispute over the ethicality of that representation, we believe Tamez could just as easily have presented the arguments that Adams & Graham made as intervenor. Since the disposition of the intervention of Adams & Graham had no bearing on the disputed denial of the turnover order, we decline to rule on point four.[2] *See* TEX. R.APP.P. 90(a).

■ The remaining points of error are essentially variations on a theme. Charles contends by point one that the court erred in denying turnover of the causes of action against Farmers and Adams & Graham. By point two, she argues that the court erred by finding that Charles failed to show that Tamez owns these choses in action, thus entitling Tamez to turnover relief. By point three, she contends that the court erred in denying turnover relief because she was entitled to aid from the court in reaching Tamez's only known nonexempt assets—the choses in action. Charles particularly challenges these findings and conclusions:

2. Defendant Tamez does not believe he has any such claims and for that reason did not desire to sue.

3. Plaintiff has failed to establish sufficient facts of the existence of the alleged claims against Adams & Graham, and the agents, servants and employees of Farmers Insurance Group.

4. Plaintiff has failed to establish sufficient facts that Defendant Tamez is in possession of any such alleged property or alleged claims.

5. Relief under the Turnover Statute, § 31.002, Tex.Civ.Prac. & Rem.Code, is discretionary and equitable in nature. Plaintiff has failed to establish sufficient

---

1. Oddly, the court on August 23, 1993, signed additional findings of fact and conclusions of law which supported the granting of the motion for turnover. Adams & Graham promptly objected because the findings and conclusions conflicted with its last order and because Charles's appeal had stripped the court of its plenary power. The court even more promptly withdrew the additional findings and conclusions, saying that they were signed due to a clerical error.

2. A court errs if it allows the judgment creditor to haul the potential defendant into the turnover action. *Republic Ins. Co. v. Millard*, 825 S.W.2d 780, 784 (Tex.App.—Houston [14th Dist.] 1992, orig. proceeding). That case does not control the situation here, where the potential defendant intervened, asking to be part of the turnover action.

facts to support relief under the Turnover Statute.

■ We review the denial of turnover relief under an abuse of discretion standard. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991). The turnover statute provides in part:

(a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

(1) cannot readily be attached or levied on by ordinary legal process; and

(2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

(b) The court may:

(1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution;

(2) otherwise apply the property to the satisfaction of the judgment; or

(3) appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment.

Tex.Civ.Prac. & Rem.Code Ann. § 31.002 (Vernon 1986). In *Gonzales v. Daniel,* we noted that appellate courts have differed as to whether the reviewed discretion applies to the determination of whether to grant relief under the whole statute or applies only to the determination of the manner of the turnover under section (b) of the statute. 854 S.W.2d 253, 256 n. 4 (Tex.App.—Corpus Christi 1993, orig. proceeding). The supreme court did not resolve this dispute in *Buller,* 806 S.W.2d at 226. The supreme court, however, relied on a case which itself explicitly held for full discretion and rejected the argument that the "entitled to aid" language in section (a) made relief mandatory. *Id.* (citing *Barlow v. Lane,* 745 S.W.2d 451, 454 (Tex.App.—Waco 1988, writ denied)). The supreme court did not refer to or adopt cases espousing the limited discretionary rule, such as *Anderson v. Lykes,* 761 S.W.2d 831 (Tex.App.—Dallas 1988, orig. proceeding). *Buller,* 806 S.W.2d at 226. We interpret the supreme court's holding to endorse discretion under the entire statute. We therefore may reverse the trial court's denial of turnover only if we determine that the court acted unreasonably, arbitrarily, or without reference to guiding rules or principles with regard to any part of the statute. *Buller,* 806 S.W.2d at 226.

■ A cause of action is a property right and can be subject to turnover under the statute. *Associated Ready Mix, Inc. v. Douglas,* 843 S.W.2d 758, 762 (Tex.App.—Waco 1992, orig. proceeding); *Republic Ins. Co. v. Millard,* 825 S.W.2d 780, 784 (Tex.App.—Houston [14th Dist.] 1992, orig. proceeding); *Renger Mem. Hosp. v. State,* 674 S.W.2d 828, 830 (Tex.App.—Austin 1984, no writ). Under the statute, Charles had only to show that Tamez owned property (the causes of action) which met the requirements (not exempt or susceptible to normal attachment or levy) to justify turnover. *Associated Ready Mix,* 843 S.W.2d at 762.

Courts have held, however, that the turnover statute does not apply in cases where turnover would violate public policy. The most relevant example of this is the line of cases which blocked turnover of causes of action to the potential defendants in those actions. *Id.; Criswell v. Ginsberg & Foreman,* 843 S.W.2d 304, 306–07 (Tex.App.—Dallas 1992, no writ); *Commerce Sav. Assoc. v. Welch,* 783 S.W.2d 668, 669–71 (Tex.App.—San Antonio 1989, no writ). These courts emphasize that the turnover remedy is intended to be a reasonable remedy to assist judgment creditors. They hold that allowing creditors to use the turnover statute to purchase potential causes of action against them in order to extinguish those claims would be unreasonable and, the Waco and Dallas courts say, unconstitutional. *Associated Ready Mix,* 843 S.W.2d at 763 (conditional grant of writ of mandamus reversing turnover order as violative of right to jury trial determination of cause of action's value); *Criswell,* 843 S.W.2d at 306–07 (vacating

turnover order as violative of open courts doctrine); *Commerce,* 783 S.W.2d at 671 (affirming denial of turnover and disapproving attempt to extinguish cause of action through turnover).

■ Adams & Graham attempts to wedge our facts into the form of the open courts challenge. The same concerns are not present. The *Criswell* court stressed that such turnover would violate the open courts provision because judgment creditors would not share the judgment debtors' desire to get maximum value out of the cause of action against the creditors. TEX. CONST. art. I, § 13; *Criswell,* 843 S.W.2d at 305–06. Here, however, the cause of action does not lie against the judgment creditor, but against the judgment debtor's attorney. The judgment creditor here has as much or more incentive to recover as the judgment debtor. The courts were also concerned by the fact that the trial courts had ordered turnover of the causes of action with no fixed idea of their value; the courts were concerned that the judgment debtors would receive no value for the causes of action. *Associated Ready Mix,* 843 S.W.2d at 762. The order of which Tamez requests reinstatement would ease this problem by ordering a sale of the cause. Through the sheriff's sale, the debtor would receive the market value of the cause of action. If anything, the debtor would be better off with the sale than not suing at all because the sale would be profit without legal fees. We reject the open courts challenge. If anything, based on the parties' argument at trial, allowing the turnover would open the courts by asserting a cause of action that might otherwise languish unasserted.

The crucial public policy question in this case is whether courts may or should allow a creditor essentially to "force" litigation of a debtor's claim against his will, particularly one arising out of a relationship as personal as that of attorney or insurer and client. Adams & Graham argues that we should not. The firm contends that we should not order turnover of a nonassignable cause of action. *See Renger,* 674 S.W.2d at 830. Assignment and turnover, though different, are linked because the public policy concerns that would bar voluntary assignment also oppose forced

transfer through turnover. The firm argues that legal malpractice claims are nonassignable. *American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480, 486 (Tex.1992) (Hecht, J., concurring). The supreme court's position on the assignability (and susceptibility to turnover) of legal malpractice claims is uncertain. The court's opinion in *American Centennial* allowed an excess insurance carrier to sue its insured's attorney under *Stowers* through equitable subrogation. *American Centennial,* 843 S.W.2d at 484–85. The five concurring justices joined in the judgment of the court with the following understanding:

> By allowing the excess carrier an action against its insured's attorney through equitable subrogation, the Court's holding does not suggest that a client's rights against his attorney may be assigned.

*Id.* at 486 (citations omitted). The precedent set by a majority of the justices concurring that they were not suggesting a proposition of law is unclear.

■ The general rule in Texas has been that causes of action, including personal injury actions, are assignable absent a statutory bar. *American Indem. Co. v. Baumgart,* 840 S.W.2d .634, 637–38 (Tex.App.—Corpus Christi 1992, no writ); *Duke v. Brookshire Grocery Co.,* 568 S.W.2d 470, 472 (Tex.Civ. App.—Texarkana 1978, no writ). As noted above, though, courts have recently blocked debtors from turning over to judgment creditors causes of action against those same creditors because the effect would be to extinguish the causes of action. *Associated Ready Mix,* 843 S.W.2d at 762; *Criswell,* 843 S.W.2d at 306–07; *Commerce,* 783 S.W.2d at 669–71. These cases are important here because they show the willingness of Texas courts to let public policy factors bar application of the turnover statute.

Other jurisdictions are divided on whether legal malpractice actions are assignable. Many states bar assignment of legal malpractice actions. *Roberts v. Holland & Hart,* 857 P.2d 492, 495 (Colo.Ct.App.1993); *Brocato v. Prairie State Farmers Ins. Ass'n,* 166 Ill.App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200 (1988); *Coffey v. Jefferson County Bd. of Educ.,* 756 S.W.2d 155 (Ky.Ct.App.1988);

*Schroeder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114 (App.1984); *Washington v. Fireman's Fund Ins. Co.*, 459 So.2d 1148 (Fla. Dist.Ct.App.1984); *Joos v. Drillock*, 127 Mich.App. 99, 338 N.W.2d 736 (1983); *Goodley v. Wank & Wank, Inc.*, 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976). Many of the courts barring assignment rely on the following reasoning of the California court, which turns on the personal nature of legal services:

> The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley*, 133 Cal.Rptr. at 87.

Other courts allow assignment. *Ikuno v. Yip*, 912 F.2d 306 (9th Cir.1990) (interpreting Washington state law); *Bergen v. F/V St. Patrick*, 686 F.Supp. 786 (D.Alaska 1988) (interpreting Alaska law); *Oppel v. Empire Mut. Ins. Co.*, 517 F.Supp. 1305 (S.D.N.Y. 1981) (interpreting New York law); *Whitehead v. Van Leuven*, 347 F.Supp. 505 (D.Idaho 1972) (interpreting Idaho law); *Thurston*

*v. Continental Casualty*, 567 A.2d 922 (Me. 1989); *Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357 (1988); *Collins v. Fitzwater*, 277 Or. 401, 560 P.2d 1074 (1977) (overruled on other grounds by *Lancaster v. Royal Ins. Co. of Am.*, 302 Or. 62, 726 P.2d 371 (1986)). The Pennsylvania court summarized this position, stating that

> [w]e will not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected.

*Hedlund*, 539 A.2d at 359.

We need not address what happens in all legal malpractice actions. Our decision turns on the intrinsically personal nature of this potential suit for malpractice. It is not like a debt action where there is objective evidence of the debt; the debtor chief decision in that case is whether to sue on the debt. Here, Tamez must first decide whether his lawyers acted contrary to his interests before deciding whether to sue for any divergence from his interest. According to Tamez's sworn testimony, Adams & Graham acted in accord with his wishes. Unless he is proved incompetent, he alone can determine if he believes that his counsel misrepresented him. His satisfaction is paramount. In an analogous situation, plastic surgery which horrifies some will be acceptable or even welcomed gladly by others. Put more simply, one person's trash is another's treasure.

The distinction runs even deeper, however. Tamez would not be allowed to fight turnover of assets merely because he considered them worthless. The trash/treasure dichotomy works the other way as well; though he might consider the assets worthless, his creditors might find them of great value. We reiterate that our holding is strictly limited to the intrinsically personal, subjective cause of action for legal malpractice for failure to settle under the *Stowers* doctrine. Tamez never attempted to assert any of the actions for which Charles seeks turnover. Rather, he denied dissatisfaction with his representation by Adams & Graham in his affidavit and in his testimony.

■ We hold that unasserted, denied causes of action for legal malpractice for failure to settle under the *Stowers* doctrine are not assets subject to turnover. We find that allowing a party to force a suit for malpractice on behalf of a satisfied opponent does not promote the specific purpose of the turnover statute or the overall purpose of the Texas legal system. We explicitly do not reach the question of whether asserted or ignored claims for legal malpractice may be turned over. *See Chaffee v. Smith,* 98 Nev. 222, 645 P.2d 966 (1982) (barring transfer of unasserted legal malpractice action but reserving opinion on transferability of previously asserted actions). The trial court did not abuse its discretion by denying turnover of these causes of action to Charles.

■ Charles also sought turnover of causes of action against Tamez's insurer, Farmers. The complaints Charles would urge on Tamez's behalf against Farmers are tied up in the same facts as those she would urge against Adams & Graham. Our decision on the turnover of those actions is the same.

■ The duty to settle lawsuits under *Stowers* is an essentially personal duty. We recognize that an insured's right to sue for failure to settle is subject to both equitable subrogation and assignment. *American Centennial,* 843 S.W.2d at 482–84 (subrogation); *Garcia v. American Physicians Ins. Exch.,* 812 S.W.2d 25, 33–34 (Tex.App.—San Antonio 1991), *rev'd on other grounds,* 876 S.W.2d 842 (1994). We do not believe that it is subject to involuntary assertion. Tamez said in his affidavit that he had no complaint regarding Farmers representation of him. He stated that he would not have allowed Farmers to settle for policy limits if he remained exposed to the hospitals' liens. He apparently believes that he was better off with no settlement and continued representation than he would have been with a settlement with Charles and no representation against the hospitals. That is his call to make. Unless he is adjudged incompetent, neither we nor anyone else is in a position to superimpose our judgment on this issue.

Tamez's satisfaction distinguishes this case from *Garcia,* 812 S.W.2d 25. In *Garcia,* an injured party recovered against an insured; while that suit was on appeal, the insured filed suit against his insurer for mishandling his defense. *Id.* at 28. Before trial of the second case, the injured party entered an agreement with the insured not to execute any judgment against the insured that exceeded policy limits; in return, the insured assigned his rights to sue his insurers. *Id.* at 32–33. The *Garcia* situation is similar to our facts with two key differences: Tamez has said he is satisfied and has not agreed to assign his rights. He apparently does not believe that he has been lied to, deceived, or misled—or, if he has, that he has been injured thereby.

A difference in the alignment of interests distinguishes this case from *American Centennial.* In *American Centennial,* the supreme court found that an excess insurance carrier could be equitably subrogated to the rights of an insured. 843 S.W.2d at 483. The equitable subrogation occurs because the excess carrier and the insured share the desire for the primary insurer to settle for policy limits; in fact, the excess carrier may have even more incentive to insist upon reasonable settlement than does the insured. *Id.* Here, the injured party does not share or assume the insured's interest in seeing that the insurer settle for policy limits. The injured party's only interest in quick settlement is avoidance of trial preparation and costs. We do not find that as compelling as the excess carrier's interest, which overlaps and even overtakes the insured's interest. The full burden of the excess judgment does not fall on the injured party, even if, as here, the insured currently has no assets to satisfy the judgment. While it is indeed unfortunate that Charles's damages may go uncompensated, we will not let sympathy cause us to drive a wedge between a satisfied client and his insurance company. We prefer to leave that relationship intact, and let the cloud of the unsatisfied judgment hang over the client. We hold that public policy bars turnover of unasserted, denied causes of action against insurers for failure to settle lawsuits. We explicitly do not address whether asserted or ignored causes of action against insur-

ers for unreasonable failure to settle may be turned over.

We recognize the potential for fraud and collusion in this regard. We must depend on assertion of the causes of action and statutes proscribing fraud and conspiracy to deter such collusion. We see no indication of such fraud or collusion on the record here.

We do not believe that our decision here deprives Charles of a valuable asset. A cause of action asserting that Tamez was injured likely would wither in the face of his adamance that he was not injured by his representation and that his attorneys and insurance company did as he wished by not settling. We deprive Charles only of an insubstantial illusion of an asset, and we relieve the judicial system of a hollow lawsuit.

We overrule points of error one and three. Our holding that the turnover statute is inapplicable moots our consideration of point two, which concerns a conclusion by the trial court regarding an element of the turnover statute.

We affirm the judgment denying turnover.