

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00147-CV

_____

IN THE INTEREST OF A.W., A CHILD

---

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 12790-JR-B

---

Before Walker, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

The trial court terminated Father's and Mother's parental rights to their daughter, A.W., after finding that (1) both failed to comply with the court order establishing the actions each parent had to take to obtain A.W.'s return and (2) terminating their parental rights was in A.W.'s best interest.[1] Tex. Fam. Code Ann. § 161.001(b)(1)(O), (b)(2) (West Supp. 2018). In this appeal, Father attacks both findings' legal and factual sufficiency; Mother attacks only the best-interest finding's factual sufficiency.[2] We affirm.

### I. Facts

#### A. August 2015 to early 2016: a "love triangle" produces a CPS investigation when Mother becomes "somewhat suicidal."

Mother and Kyle were in a relationship and had two daughters together, Joan and Ruth, when Mother met Father around August 2015. Needing transportation to a hospital for one of her children, Mother posted a request for help on Facebook, and Father volunteered "as a good man." By December 2015, Mother was pregnant with Father's baby—A.W. By February 2016, they were married.

---

[1]To protect the privacy of the parties in this case, we identify the child by her initials, others by fictitious names, and the parents simply as Father and Mother. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2018).

[2]In his third issue, Father also attacks the trial court's best-interest finding against Mother and adopts her arguments by reference. Because he has no standing to assert issues that affect only Mother, we overrule Father's third issue. *See In re D.C.*, 128 S.W.3d 707, 713 (Tex. App.—Fort Worth 2004, no pet.).

Father maintained that Mother knew he was a registered sex offender from the very start of their relationship. But Mother testified that she did not learn this until after she married Father.[3]

Father's sex-offender registration was the product of his 2003 conviction for committing the offense of indecency with a child; sentenced to twelve years in prison, he served more than ten of those years. Father admitted in this proceeding that after being paroled, he refused to take a polygraph test, had his parole revoked, and served the remainder of his sentence in a county jail until his discharge in 2014. Father also had convictions for unauthorized use of a motor vehicle and credit-card abuse.

Although Mother was married to Father and pregnant with his baby, in early 2016 she resumed her relationship with Kyle, and Father found himself in an uncomfortable "love triangle." Father described Kyle as violent and as a drinker and drug user. Things got worse when Kyle learned that Father was a registered sex offender; Kyle became more aggressive, got "mad and jealous," and encouraged Mother to leave Father. Father and Kyle even got into a fight on July 4, 2016, while Kyle had Ruth in his arms. When Father saw Mother cutting herself and becoming "somewhat suicidal," he became concerned for his unborn child's welfare and called the Department of Family and Protective Services. The Department responded not by removing Joan and Ruth but by setting up a family-based-safety-services (FBSS) case

---

[3]In its findings of fact, the trial court sided with Father's version.

for them. *See* Tex. Fam. Code Ann. § 264.204 (West 2014) (addressing services for less serious cases).

### B. August 2016: the Department investigates a false alarm concerning Father and Mother shortly after A.W.'s birth.

Mother gave birth to A.W. in August 2016. Responding to a call that Father and Mother were insufficiently attentive to their newborn at the hospital, the Department investigated but discovered nothing substantiating the concern.

### C. September 2016: the Department investigates and finds "reason to believe" neglectful supervision for both parents based on domestic violence.

By September 2016, the Department had again investigated Father and Mother after a report that Father and Mother had engaged in domestic violence with all three children present. Both the Department investigator, Amanda Moreno, and the FBSS worker, Angelia Arbuckle, first went to Mother's residence and, not finding them there, then to Father's residence, where they found Father with scratches on his face.[4]

Father denied that the scratches had occurred that day but admitted to Moreno and Arbuckle that they were from a different incident after which the police had

---

[4]Because of Father's registration requirements, Father testified that he could not live with Mother. From his testimony, it is not clear whether he was prohibited from living with Mother or whether he was prohibited from living with Mother's children. Mother testified that when she married Father, she had her own apartment and that her two other daughters lived with her; she denied that she and her daughters ever moved in with Father. Later, Mother admitted having moved in with Father after she lost her apartment, but she denied that her daughters moved there with her because by that time the Department had already removed them.

4

arrested Mother.[5] Mother acknowledged that the police had arrested her for another incident but professed ignorance to Moreno and Arbuckle about why that was.

Regarding the incident that Moreno and Arbuckle were responding to, neither Father nor Mother wanted to discuss it.[6] Seeing bruises on Mother's arms, Moreno asked her how she got them, but Mother simply replied that Moreno did not need to know.

After Moreno and Arbuckle discussed the case with their supervisors, it was decided that both parents' contact should be supervised, which necessitated placing A.W. elsewhere. Determining that they did not have exigent circumstances to justify a removal, they decided to include A.W. in the ongoing FBSS case and placed A.W. in Father's mother's home; although Father was living there too, his contact was to be

---

[5]Father testified that all three children had been present. Father explained that Mother thought that he had contacted one of her friends, became jealous, and started hitting him. Mother purportedly assaulted Father while he had A.W. in his arms. When Father walked off with A.W., Mother called the police and alleged that a registered sex offender had kidnapped her baby, but when the police arrived and saw the scratches on his face, they arrested Mother.

[6]Father testified about another incident that contextually appears to be the one that Moreno and Arbuckle responded to. Father stated that after the face-scratching incident, Mother was court-ordered to stay away from both him and A.W. Claiming he knew nothing about the court order, Father later went to Mother's apartment and spent the night there. The next morning when he got in his car to leave, Mother jumped into the backseat, said that he was not going to leave her, and started choking him. Sheriff's deputies who happened to be passing by intervened and arrested Mother for family violence and for violating the court order. Father then signed non-prosecution statements for both incidents and managed to get the protective order dropped.

supervised. After then reviewing the police report—which contained the details that Father and Mother had declined to discuss with Moreno and Arbuckle—the Department found "reason to believe"[7] against both Father and Mother for neglectful supervision based on domestic violence.[8] Domestic violence, as Moreno explained, rises to the neglectful-supervision level when children could be potentially harmed during the dispute; the Department also considers the emotional toll that domestic violence has on children.

**D. October 2016: the safety plan fails, and the Department removes A.W.**

The next month, in October 2016, the Department removed A.W. from the safety placement with Father and Father's mother.

Father explained that on the day the Department removed A.W., he had to register at the local law-enforcement agency and that because his mother was unavailable, he asked Mother to watch A.W. for about 30 minutes. After registering, Father returned to Mother's apartment only to find that A.W. was gone.

---

[7]After investigating abuse or neglect allegations, the Department has to assign one of five possible dispositions to each allegation; the five possible dispositions are (1) reason to believe (based on a preponderance of the evidence), (2) ruled out, (3) unable to complete, (4) unable to determine, and (5) administrative closure. 40 Tex. Admin. Code § 700.511(b) (2018) (Tex. Dep't of Family & Protective Servs., Disposition of the Allegations of Abuse or Neglect); *see Taylor v. State*, No. 02-16-00299-CR, 2017 WL 5894923, at *3 n.3 (Tex. App.—Fort Worth Nov. 30, 2017, pet. ref'd) (mem. op., not designated for publication).

[8]*See In re S.N.*, 287 S.W.3d 183, 189 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (op. on reh'g) (holding that grounds under subsection (O) require a removal for abuse or neglect).

Mother told Father that her cousin had taken A.W. and that Mother was signing her rights away to that cousin.[9] When Father could not find Mother's cousin and A.W., he called 911 and then headed to the Department's offices after the police told him that A.W. was there.

The Department filed its petition that same day, and the trial court signed an emergency order making the Department A.W.'s managing conservator.

After the Department filed its petition, it developed service plans for both Father and Mother, which the trial court adopted as its court order. Among other requirements, Father was ordered to

- participate fully in and successfully complete individual therapy;

- avoid all criminal activity and resolve any pending criminal charges before placement would be considered;

- follow all recommendations regarding domestic violence and, if asked to attend batterers-intervention services, successfully participate in and complete them (Father was referred to a batterers-interventions program (BIP)); and

- fully participate in and complete parenting classes.

---

[9]The removal affidavit attached to the petition asserts that Mother gave A.W. to her cousin for the express purpose of placing A.W. with the Department because Mother did not want A.W. in Father's care. Regardless, Father's testimony shows that both Father and Mother had unsupervised contact with A.W.; the safety placement had failed.

7

**E. December 2016: Father files for a divorce without wanting one.**

Father filed for divorce and served papers on Mother in December 2016 because he was tired of hearing about how he and Mother had to separate because he "was on the registry." But because Father still loved Mother, he conceded that he did not want to follow through on the divorce.

**F. December 2016 to January 2017: Father goes to individual counseling sessions, does well, and then stops going altogether.**

Also in December 2016, Father started a six-session individual-counseling series with Arthur Madden. During a January 2017 session, Madden saw Father with scratch marks down his cheek and neck that Father, in the following session, admitted Mother had caused. Father acknowledged filing for divorce, but Madden added, "[A]t no time did I get the impression that he really wished no future contact with his wife." During these first six sessions, Madden described Father as "a compassionate individual, insightful, open, ready to discuss and talk about just about anything," as "very open," and as a willing and active participant.

After the first series of sessions, the Department referred Father to Madden again, but Father came to only one session. Madden thought that the Department had referred Father for only one additional session, but he later added that such a limited referral was "highly unlikely." In any event, Madden planned on a follow-up session but was not sure whether one ever occurred. The caseworker, Jill King, testified that after the first six-session series was over, she referred Father to Madden and asked

8

Father to continue going to sessions until Madden released him. An October 24, 2016 temporary order specifically provided, "Said counseling sessions [for Father] shall continue until the counselor determines that no further sessions are necessary or until further order of this Court." Father admitted attending at least seven sessions altogether.

### G. March 2017: the police arrest Father for domestic violence shortly after Father stops seeing Madden.

King, the caseworker, testified that the police arrested Father in March 2017 for domestic violence. Mother told King that Father had assaulted her and sent King a photo showing Mother's bleeding mouth. King agreed that this incident would have occurred about the same time that Father had completed his first six sessions with Madden.

### H. March 2017: one of Mother's other children makes a sexual-abuse outcry against Father; prosecutors bring no charges, but the Department finds "reason to believe."

Meanwhile, in March 2017, Mother's oldest child, Joan—who had just turned four years old—made an outcry while in foster care that Father had sexually abused her.

Jennifer Pond was the Department investigator for this new allegation. She explained that the Department's policy was to screen a child, and if the child made an

outcry, the Department would stop its screening and schedule a forensic interview at Patsy's House.[10]

Upon screening Joan, Pond found Joan credible based on the words she had used, which Pond did not expect a child to know. Specifically, Joan said that Father had touched her private parts with his "dick" and that it was hard.

Pond acknowledged that there had been an earlier investigation in which Joan's father (Kyle) had accused Father of touching her. Although Pond was not the investigator in that instance, she recalled that the disposition then was "ruled out."

In Pond's case, Pond did not think that Joan was coached. She explained that coached children go back to the same sentence often and when asked to elaborate, "they don't always have an answer."

At the Patsy's House forensic interview, which Pond attended, Joan shut down, and the forensic interviewer's conclusion differed from Pond's. Pond conceded that "people more highly trained in conducting interviews of children for the purposes of use in court reached a different conclusion than [she] did . . . ." Pond said that she was at least 75% sure that Joan knew the difference between telling the truth and telling a

---

[10]Patsy's House is a Children's Advocacy Center in Wichita Falls. *Patsy's House*, http://patsyshouse.org (last visited 10/15/18). According to its website, "Children's Advocacy Centers (CACs) provide a safe, child-friendly environment where law enforcement, child protective services, prosecution, medical and mental health professionals may share information and develop effective, coordinated strategies sensitive to the needs of each unique case and child." *Id.*, http://patsyshouse.org/why-cac/ (last visited 10/15/18).

lie. Despite the forensic interview, the Department found "reason to believe."[11] Nevertheless, prosecutors did not charge Father with allegedly sexually abusing Joan.

When asked whether she believed that Father had sexually abused Joan, Mother answered, "He told me he didn't do that. I keep asking him over and over. I've asked him so many times. And then he hit me." Ultimately, though, she answered, "I don't think—I don't believe that he did it."

## I. Mother believes Father is cheating on her with a minor.

Pond's investigation unearthed yet another concern. Through talking with Mother, Pond discovered that Mother was upset with Father for several reasons, one of which was that Mother thought, based on text messages, that Father was cheating on her with a minor. Mother's concerns were passed on to law enforcement, and the police investigated Father's relationship with the minor. The minor in question had just turned 15 years old and was on juvenile probation for assaulting Mother.

When questioned about the minor, Father described her as a stalker on whom they were "always calling the cops." But further questioning resulted in Father's invoking his Fifth Amendment right to remain silent.

---

[11]A "reason to believe" finding requires a preponderance of the evidence. 40 Tex. Admin. Code § 700.511(b).

## J. January 2018: Father is incarcerated in the county jail on multiple charges; Mother visits him weekly.

Father testified that he was currently incarcerated for "[f]amily violence, failure to comply with registry, compelling prostitution of a child under 18, and five counts of sexual assault for the same compelling prostitution." None of the charges involved the minor with whom Mother feared Father was having relations. Father admitted being arrested on January 8, 2018, an arrest that had not escaped the caseworker's notice. Father maintained his innocence and complained that his registry status made him a police target.

Father said that Mother came to visit him every Wednesday—with possibly one exception due to snow—and that they wrote each other letters. He estimated that she had visited him seven times[12] and asserted that their relationship was still ongoing, they were still married, and he was in love with her. For her part, Mother agreed that she had visited Father every single week since he had been incarcerated—but she also admitted having a new boyfriend.

## K. Numerous controversies surround Father's failure to take the batterers-intervention program.

Father was referred to a BIP but did not attend. Father testified that it would have cost him $600 to go through the BIP and that because he could not afford it,

---

[12]Father was arrested on January 8, 2018, and trial started on March 12, 2018, so Father's estimate appears correct.

Judge Bondurant[13] had given him permission to take an online class, which Father did. From taking the online class, Father maintained that he had learned that, provided the children were not present, family violence presented no danger to them.

In contrast to Father, and openly questioning his credibility, King testified that the BIP cost $25 per session and that she did not recall Judge Bondurant's ever having told Father that an online domestic-violence course would be acceptable or having excused Father from doing the BIP. The online class, she said, was "nowhere near the equivalent," explaining that the BIP required a parent to interact with other batterers and with instructors who assessed the parent's progress and attitude. King added that normally the Department told parents that it paid for the services, but in this instance, because the Texas Department of Criminal Justice offered the services, the Department was not allowed to pay for them. Father maintained that before he was incarcerated, he made about $2,400 per month detailing cars. Despite that, he claimed that he could not afford to pay the BIP $25-per-session fee.

**L. Similar controversies surround Father's failure to take parenting classes.**

Father asserted that he took parenting classes online as well. King again did not consider that compliance. She said that she had never known Judge Bondurant to approve an online class for anyone and specifically did not recall Judge Bondurant's having given Father permission.

---

[13]The Honorable Alyce Bondurant, an associate judge.

13

**M. Father engages in domestic violence against Mother, but Mother is financially dependent on him.**

Mother told King that Father had engaged in family violence against her—kicking and choking her—on multiple occasions. Mother explained to King that she was with Father only when he helped her financially. Although legally married to Father, when Mother appeared for trial and again when she took the stand to testify, she specifically asked not to be addressed by his last name. Mother had a hearing impairment that affected, to some degree, her ability to find work, and Mother depended on Father financially.

**N. Mother engages in family violence against Father, but Father wants to stay with her.**

On the other hand, Father told Madden that Mother was the volatile and aggressive one. Under those circumstances, Madden asked Father why he stayed with a violent and aggressive person, and Father responded that he was "a loyal, nice guy and wanted to help her out . . . ." Madden elaborated, "I think that he might view himself as this loyal individual who doesn't really give up or separate from anybody, so I think really . . . his personality might be . . . to try to keep everything together, try to keep everything sort of functioning. It just wasn't very successful."

**O. Mother's stumbles.**

Mother did not appear for the first day of trial. Mother's sign-language interpreter informed the court that Mother had told her that she was at the fair and could not attend. She also assured the trial court that when it had announced the

14

March trial setting in January, she had translated the trial date for Mother and that Mother's attorney had also written it down for her. Mother appeared for the second day of trial, but she returned from the lunch break about ten minutes late. Mother was also not present when the third day of trial started but appeared shortly thereafter. When asked where she was on the trial's first day, Mother admitted she had been at a fair in Dallas with family.

King said that at one time Mother had assisted housing but lost it in February or March 2017 because she had not maintained the community-service requirements. Mother admitted that she lost her assisted housing for that reason and explained that she "was too lazy and . . . pregnant."[14] Since Father's incarceration two months earlier, Mother had been living with her mother.

Mother twice admitted that she had not completed her service plan.

On the plus side, Mother had been working at a Carl Jr.'s for the three weeks preceding trial.

## P. A psychologist assesses Father and Mother.

A psychologist, Dr. Brandon Bates, assessed both Father and Mother.

---

[14]The record shows that Father and Mother had a second child in September 2017; the Department removed and placed this second child with A.W. in a foster home in October. A.W.'s younger sister is not a party to this suit.

### 1. Dr. Bates on Father: he has antisocial features.

Dr. Bates's diagnoses for Father were "child sexual abuse, partner violence, and unspecified personality disorder with antisocial features." Regarding the last diagnosis, Dr. Bates elaborated: "[T]he personality disorder part is more of a[n] . . . enduring type of . . . trait that an individual has, and one [thing] that was evident throughout much of his [assessment] was the antisocial part[,] especially . . . the violation of others' basic rights and the lack of concern with others and their rights." Dr. Bates said that the prognosis for someone with a personality disorder "is usually pretty poor especially when . . . we have a history of the same behaviors being repeated." Regarding domestic violence, Dr. Bates did not recall Father's admitting ever being the perpetrator; rather, Father identified Mother mostly as the perpetrator.

On parenting, Dr. Bates said that Father's scores on power and independence were potentially problematic. Dr. Bates explained that it was more of "an authoritarian style of parenting and you do what I say because I told you to where there's not . . . a lot of empathy to [children] and to their ability to think and to make decisions on their own." Father was "a high risk for abuse in that area." Although none of Father's other scores indicated a high risk, his scores on inappropriate expectations and lack of empathy were borderline high risk. For a child in the same household as Father, Dr. Bates asserted that it could be a safety concern. The main concern was that someone who was extremely controlling and very authoritarian could halt a child's emotional development.

16

## 2. Dr. Bates on Mother: she has dependency features.

Dr. Bates's diagnoses for Mother were "[m]ajor depressive disorder, persistent depressive disorder, partner violence, and personality disorder not otherwise specified with dependent features."

Regarding the first two, he added that "[t]he easiest way to look at both of those is the major depression is really severe symptoms that don't usually last for more than a few months whereas the persistent depressive disorder, or dysthymia, is lower levels of depression that are just kind of always there . . . ." He continued, "So . . . one of the things that I saw was that there had been this kind of lifelong depression and then she would have periods of a major depression within those."

Concerning the personality disorder with dependent features, he said: "Well, . . . her history, the interview, and then the testing verified much of it." He added, "[W]hat became apparent was a lot of problems separating from those who were negative influences and a need to . . . be with someone. That was one of the things that was apparent throughout most of what we did. That—just that unhealthy dependency on another person."

Regarding parenting, Dr. Bates said, "The primary concern with that is the lack of ability to have healthy boundaries with people who . . . may not be healthy for our children to be around." The prognosis for addressing a dependent-personality disorder was not as poor as it would be for an antisocial disorder but would still require "a significant amount of counseling and oversight."

17

Mother reported a history of violence between her and Father that differed from Father's. She described Father as very threatening and as saying often, "[J]ust watch what would . . . happen if you . . . leave me," in a threatening manner. She reported that Father had initiated violence but did not report how often it had happened.

On a more positive note, Mother's parenting-views responses fell in the medium- to low-risk range and were very similar to those of the average population. Mother's primary problem, Dr. Bates explained, was her inability to separate herself from those people who were negative influences.

### 3. Dr. Bates on domestic violence and children: domestic violence places their emotional well-being at risk.

Domestic violence between parents can adversely affect children's emotional well-being. One of the "obvious" consequences is that "[t]hey engage in more domestic violence than people who haven't been exposed and more violence in general." Another consequence is "a high level of depression and anxiety both that come along with children who have been exposed to domestic violence." Dr. Bates thought that the level was high enough in homes with domestic violence to place children's emotional well-being at risk.

Dr. Bates said that both Mother and Father blamed the other for the domestic violence and that neither one accepted responsibility for being the perpetrator.

## Q. The foster (and prospective adoptive) mother testifies.

Tammy was A.W.'s and A.W.'s younger sister's foster mother. A.W. was less than two months old when placed with Tammy and was almost 18 months old at the time of trial.

Two days after being placed with Tammy, because A.W. had clubfoot, an orthopedic surgeon placed A.W. in casts. Each week for three weeks the doctors would give A.W. a new cast, and thereafter A.W. wore braces to correct her condition.

Tammy loved A.W. and wanted to adopt both her and her younger sister if the opportunity arose. Tammy said, "I want her to be secure, and I want her to grow up strong and independent and sure of herself and not have to worry about anything, have everything that she needs, given every opportunity to excel in life." Both Tammy and her husband had full-time jobs and could provide A.W. with a stable environment.

On cross-examination, Tammy admitted having to take A.W. once to the emergency room when A.W. had pulled microwaved soup off the counter and burned herself. She also acknowledged that after visits with Mother and Father, A.W. would occasionally come back with diapers and wipes that Mother and Father had provided.

King, who had seen A.W. in her placement many times, stated that the placement was "completely" meeting her needs. A.W. went to her orthopedic surgeon appointments for her club feet, was fed, had clean clothes, was happy, and appeared bonded to the placement.

## II. Arguments

Father asserts evidentiary legal- and factual-sufficiency challenges. Mother limits her issue to factual sufficiency.

### A. Standard of Review

#### 1. Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re*

20

*J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish, by clear and convincing evidence, two things: (1) that the parent's actions satisfy just one of the many grounds listed in family code section 161.001(b)(1), and (2) that termination is in the child's best interest under section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; that is, termination may not be based solely on the child's best interest as determined by the factfinder. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

**2. Legal sufficiency**

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We also must disregard all evidence that a reasonable

factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor because that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### 3. Factual sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or

conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Discussion

### 1. Father's sufficiency attacks on the sections 161.001(b)(1)(O) and 161.001(d) findings fail.

The trial court adopted the Department's service plans for both parents as its court order. Failing to comply with this order was the only ground under section 161.001(b)(1) that the trial court found against both Father and Mother. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). Mother did not contest her noncompliance at trial and does not contest it here on appeal. But Father did and still does, and his argument encompasses not only section 161.001(b)(1)(O) but section 161.001(d) as well.

### a. Section 161.001(d) does not apply to this case.

Under his first issue, Father contends that the evidence is insufficient under both sections 161.001(b)(1)(O) and 161.001(d). These two sections now work in tandem.

With certain qualifiers, section 161.001(b)(1)(O) provides that one ground for termination is if the trial court finds by clear and convincing evidence that the parent failed to comply with a court order specifically establishing the actions the parent had to take to obtain the child's return. *Id.* [15]

---

[15] Section 161.001(b)(1)(O) provides:

Like a codicil, section 161.001(d) provides that the court may not find grounds under section 161.001(b)(1)(O) if the parent proves by a preponderance of the evidence that (1) the parent was not able to comply, (2) the parent made a good faith effort to comply, and (3) the failure to comply was not attributable to any fault of the parent. *Id.* § 161.001(d) (West Supp. 2018).[16]

---

(b) The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

   (1) that the parent has:

      . . .

      (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

      . . . .

*Id.*; *see In re G.C.*, No. 02-17-00259-CV, 2018 WL 547784, at *16 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.) (citing *In re N.A.*, Nos. 02-13-00345-CV, 02-13-00346-CV, 2014 WL 814195, at *5 (Tex. App.—Fort Worth Feb. 28, 2014, no pet.) (mem. op.) (stating that subsection (O) looks only at a parent's failure to comply with a court order without referring to the quantity of failure or the degree of compliance and that it provides no means for evaluating partial or substantial compliance with a plan)).

[16]Section 161.001(d) provides:

(d) A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:

On both sections, the trial court made findings against Father.

But Father misplaces his reliance on section 161.001(d). It applies only to suits filed on or after its effective date, which was September 1, 2017. Act of May 26, 2017, 85th Leg., R.S., ch. 317 §§ 12, 73(c), 79, sec. 161.001(b)(1)(d), 2017 Tex. Sess. Law Serv. 615, 618, 640–41 (West) (to be codified at Tex. Fam. Code § 161.001(b)(1)(d)). The Department filed its suit on October 11, 2016, before the effective date, thereby making section 161.001(d) inapplicable. Because section 161.001(d) does not apply to Father's case, the trial court's findings in that regard are moot. *See Charles v. Tamez*, 878 S.W.2d 201, 209 (Tex. App.—Corpus Christi 1994, writ denied). The dispositive question is thus whether the Department met its burden under section 161.001(b)(1)(O).

### b. Legally and factually sufficient evidence supports the trial court's section 161.001(b)(1)(O) finding.

#### i. Father did not successfully complete individual counseling.

Father was ordered to participate fully in and successfully complete individual therapy. The caseworker testified that she referred Father to Madden for individual

---

(1) the parent was unable to comply with specific provisions of the court order; and

(2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

*Id.*

therapy and that the Department would generally authorize six initial sessions. She further explained that after those six sessions, she again referred Father to Madden and asked that Father continue going until Madden released him.

Madden appeared confused about what happened after the initial six sessions. He said that the Department then referred Father for a single session, but he later added that he thought that it was "highly unlikely" that the second referral was for only one session. Regardless, Madden anticipated a follow-up session but was not sure if one occurred. Father acknowledged attending at least seven sessions. As an instance of noncompliance, King cited Father's failure to attend the remaining counseling sessions, and the trial court specifically found King credible on that issue. The trial court was not unreasonable in finding that Father had not successfully completed his therapy. *See J.P.B.*, 180 S.W.3d at 573.

### ii. Father engaged in criminal activity and did not resolve his pending criminal charges.

Father was ordered to avoid all criminal activity and to resolve any pending criminal charges before placement would be considered. Although Father was not convicted of any new offenses while the case was pending, he found himself embroiled in a great deal of activity that is fairly described as criminal.

Father testified that he was currently incarcerated for "[f]amily violence, failure to comply with registry, compelling prostitution of a child under 18, and five counts of sexual assault for the same compelling prostitution."

King remembered when the police arrested Father in March 2017 for domestic violence. Mother told King that Father had assaulted her and sent King a photo showing Mother's bleeding mouth. The police arrested Father again in January 2018 for, among other things, one count of domestic violence. Mother told King that Father had kicked her in the back.

Father invoked his Fifth Amendment right not to testify when asked about domestic violence and when asked about a minor with whom he may have been having sexual relations. The Fifth Amendment does not forbid adverse inferences against witnesses in civil actions. *Gebhardt v. Gallardo*, 891 S.W.2d 327, 331 (Tex. App.—San Antonio 1995, no pet.).

Under these circumstances, we are tempted to refer to "smoke and fire" but will instead focus on something far narrower: Father's engaging in domestic violence against Mother. Although Father maintained his innocence, the trial court did not have to believe him. *See In re L.A.F.*, 270 S.W.3d 735, 740 (Tex. App.—Dallas 2008, pet. denied) ("It is the classic province of the trier of fact to pass upon the credibility of evidence introduced before it and to accept all, part, or none of it."). Mother testified that Father engaged in domestic violence, and the trial court, as the factfinder and as shown in its fifty-second factual finding, believed her. *See J.P.B.*, 180 S.W.3d at 573.

Father complains that the trial court was inconsistent in believing Mother regarding the domestic abuse but disbelieving her about when she first learned Father

27

was a registered sex offender. Father effectively treats Mother's credibility as an all-or-nothing proposition, but that is not how it works. "[T]he fact finder . . . enjoys the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness." *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.).

### iii. Father's taking an online domestic-violence class was not compliance.

The court ordered Father to follow all recommendations regarding domestic violence and, if asked to attend batterers-intervention services, to successfully participate in and complete them. Father was referred to a BIP but did not attend. Although Father testified that Judge Bondurant gave him permission to take an equivalent course online, King did not recall that permission. With no written order authorizing this deviation, the question came down to whom to believe, and the trial court believed King, which we hold was not unreasonable. *See J.P.B.*, 180 S.W.3d at 573.

### iv. Father's committing domestic violence, getting arrested, and facing multiple new charges supports the trial court's findings that Father had not shown that he had learned how to be a good parent.

The court also ordered Father to participate fully in and complete parenting classes. The service plan provided that "[Father] will demonstrate what was learned from the classes during visits with the child and in conversation with this caseworker." Father asserted that he took parenting classes online as well. King stated

28

that she did not consider that compliance either, saying that she did not recall Judge Bondurant's giving anyone permission to take an online class and specifically did not recall Judge Bondurant's giving Father such permission. *See id.*

But Father notes that the trial court, in its findings, did not fault him for not taking parenting classes but for not showing that he had learned anything from them. Specifically, the trial court found that Father "did not process the lessons from his counseling sessions and parenting classes to the point that he could be a good parent to [A.W.]" and that Father "did not demonstrate an ability to put the needs of the child above his own to the point that he could be a good parent to [A.W.]"

The record supports these findings. Despite having a newborn child, Father engaged in domestic violence and found himself sitting in jail awaiting trial on multiple alleged offenses. Father maintains that he essentially is a helpless victim and that the police and prosecutors have targeted him based on his registered-sex-offender status. It might well be that the police and prosecutors have kept a closer eye on Father precisely because he is a registered sex offender, but we reject Father's argument that his conduct had no bearing on his arrests or on his indictments. Even if Father is ultimately acquitted, he has not learned how to avoid situations that lend themselves to arrests and indictments. While awaiting trial and, if convicted, while serving his sentence(s), Father has put himself in a position where he is unavailable to support A.W. even if his parental rights were not terminated. It seems self-evident that domestic violence, arrests, and indictments are inconsistent with good parenting.

29

*See In re A.M.*, No. 02-16-00208-CV, 2016 WL 7046858, at *4 (Tex. App.—Fort Worth Dec. 2, 2016, no pet.) (mem. op.) (noting that father's repeated incarcerations suggested his parenting skills were seriously suspect).

### v. Conclusions

Viewing the evidence in the light most favorable to the judgment, we hold that a factfinder could have reasonably formed a firm belief or conviction that Father did not comply with the court order setting out the actions that he had to take to obtain A.W.'s return and thus that the evidence is legally sufficient to support subsection (O) grounds. *See J.P.B.*, 180 S.W.3d at 573; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

Next, based on the entire record and giving due deference to the factfinder, we also hold that a factfinder could have reasonably formed a firm conviction or belief that Father did not comply with the court order setting out the actions that he had to take to obtain A.W.'s return and that the evidence is therefore also factually sufficient. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

We overrule Father's first issue.

## 2. Father's and Mother's sufficiency attacks on the trial court's best-interest findings fail.

### a. Standard of review

We acknowledge the strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). To determine the child's best interest, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both a subsection (1) ground and subsection (2)'s best-interest determination. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include—

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some of them may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one of these factors may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, in some cases, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### b. Discussion

Despite suspecting Father of sexually molesting one of her daughters and of cheating on her with a minor, despite Father's present incarceration awaiting trial, and despite the possibility that Father might be sent back to prison, Mother continued to visit Father weekly in jail. Mother also brought her previous boyfriend into her relationship with Father to create what appeared to be an unwelcomed love triangle. And while Father was in jail awaiting trial, Mother admitted having another boyfriend. Despite all this, Father made it clear that he intended to continue his relationship with Mother. Both parents made the trial court treat them as a single unit for purposes of raising A.W.

Father and Mother mutually engaged in domestic violence against each other. Mother admitted Father assaulted her twice. Father described at least two instances when Mother assaulted him. Father himself testified to one incident when Mother hit

him while A.W. and her two half-siblings were present. The record did not suggest that the violence had ended or would end. King testified that neither Father nor Mother had shown any changes in behavior. Dr. Bates testified that domestic violence creates an emotional danger to children and in particular that children from homes with domestic violence are generally more violent themselves and experience a high level of depression and anxiety. *See Holley*, 544 S.W.2d at 371–72.

Father and Mother were repeatedly breaking up and getting back together. Mother thought that she and Father had broken up and reconciled perhaps three times in the past year. King put the number at eight. Whatever the actual number, this pattern did little to suggest they would definitively stay apart but did a great deal to show a chaotic and unstable relationship. Permanence and stability are paramount in the upbringing of children. *In re D.S.*, No. 02-15-00350-CV, 2016 WL 1267808, at *9 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.) (citing *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) & *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). Father and Mother offered A.W. the antithesis of permanence and stability. *See Holley*, 544 S.W.2d at 371–72.

Father was a convicted sex offender, was suspected of sexually molesting one of Mother's other children, and was suspected of having sexual relations with a minor. A reasonable person could perceive Father as posing a danger to A.W. *See id.*

Father was awaiting trial in jail for other alleged sexual offenses. Father had already spent over ten years in prison on his first sexual-offense conviction. If convicted and sent to prison again, he would not be available physically or financially to help raise A.W. Mother's prospects of living independently seemed poor. She lost her assisted housing because she was admittedly lazy. Mother's ability to promote A.W.'s future well-being on her own is doubtful, and her ability to promote A.W.'s future well-being with Father is nil if he goes to prison and problematic even if he does not, given their relationship's chaotic and violent nature. *See id.*

On parenting, Father's scores on power and independence showed a high risk for abuse, and his scores on inappropriate expectations and lack of empathy were borderline high risk. Cumulatively, Dr. Bates testified, they posed a concern for a child in the same household as Father, the primary concern being that Father's parenting might halt a child's emotional development.

According to Dr. Bates, his primary concern with Mother's parenting was her personality disorder with dependent features. Such people lack the ability to have healthy boundaries with others, who might in turn then pose an unhealthy risk to their children. An example that comes to mind is a mother with small children who has a relationship with a child molester and, in the process, gives the molester access to her children.[17]

---

[17]Father complained that Arbuckle and King both told him that no matter what he did, he would not get A.W. back. King admitted that on several occasions, Father

34

In contrast, the foster parents who wanted to adopt A.W. had a stable marital relationship, had jobs, and had shown that they could provide A.W. a safe and nurturing home.

### c. Conclusion

Viewing the evidence in the light most favorable to the judgment, we hold that the evidence is such that a factfinder could have reasonably formed a firm belief or conviction that terminating Father's parental rights was in A.W.'s best interest; the evidence was thus legally sufficient.[18] *See J.P.B.*, 180 S.W.3d at 573; *see also* Tex. Fam. Code Ann. § 161.001(b)(2).

Similarly, based on the entire record and giving due deference to the factfinder, we also hold that a factfinder could have reasonably formed a firm conviction or belief that terminating both Father's and Mother's parental rights was in A.W.'s best

---

asked if doing all his services would result in getting his daughter back, and King told him that because of his sex-offender status, the Department was not looking at placing her with him. Mother too acknowledged that the Department told her "time and time and time again" that it would not return A.W. to her so long as she was in a relationship with Father. Despite the Department's hardline stance, Father's and Mother's objective—like any other litigation where the parties are at loggerheads—was not to persuade the Department to change its mind but to persuade the factfinder at trial to find in their favor notwithstanding the Department's opposition. Working services might not have ever persuaded the Department under these circumstances but, in some cases, might make a difference with the factfinder.

[18]As noted earlier, Mother did not attack the best-interest finding's legal sufficiency.

interest; the evidence was therefore also factually sufficient. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *see also* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule Father's second issue and Mother's sole issue.

## III.    Disposition

Having overruled Father's and Mother's issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  October 18, 2018